OPINION OF THE COURT
Sondra Miller, J.
The novel issue of the value of a teaching license which has merged into a teaching career is before the court in this divorce proceeding.
Prior to trial, many of the issues concerning this long-term *851 "no frills” marriage were settled by stipulation, including the grounds for divorce, joint custody of the parties’ unemancipated 10-year-old son, the physical residence of the child with his father and a schedule of visitation with the mother, the waiver of all claims by both parties to child support and maintenance, the distribution of personal property and the value of various marital assets. Pursuant to their stipulation, the parties agreed that the marital residence is valued at $267,500, the husband’s pension at $25,699, the husband’s TDA benefits at $113,437. Although there was no agreement as to the value of the wife’s pension, the sole testimony presented at the trial was on behalf of the husband who evaluated the wife’s pension between $6,900 and $7,800. Each party agreed to pay his or her own legal fees. They agreed to divide their pensions and the husband’s TDA benefits equally.
The issues remaining for determination are: (1) the value of the husband’s teaching license, (2) the value of the improvements the husband made on the marital residence, (3) whether or not the wife dissipated marital assets by failing to contribute her earnings to the family or to her husband’s education, and (4) an equitable distribution of the marital residence and the husband’s teaching license or career.
THE BACKGROUND
The parties were married in January 1966. At the time of the marriage, the defendant husband was employed as a building superintendent in The Bronx. The parties established their initial marital residence in an apartment provided by the landlord in the building where the defendant was superintendent. Thereafter, he continued to be employed as superintendent from 1966 to 1974, and was a member of the Building Service Employees International Union, Local 32E. At the time of their marriage, he was attending Bronx Community College on a part-time basis and was enrolled in a program in which he sought to receive an associate degree in engineering. He received this degree from the college in 1969 and thereafter continued to attend City College where he received a B.S. degree in 1973 and after that a Master’s degree from Hunter College in 1975. The defendant has been employed as an industrial arts teacher with the New York City Board of Education since 1973. He received his New York State permanent teaching certificate in September 1976.
At the time of the marriage, plaintiff wife was employed as *852 a meat wrapper in a local supermarket. She was a high school dropout. She continued working on a part-time basis as a meat wrapper, but stopped working after the birth of the parties’ first child, James, in 1969. She testified to assisting the defendant in various superintendent-related jobs in connection with his duties at the building. She described these jobs as being substantial, he described them as being minimal. In the course of the marriage, she earned a high school equivalency degree and 30 college credits. She returned to the job market in 1981 when the younger child, Steven, was two years old. Her income and skills appreciated and by 1987 her gross income was $25,872 earned as an employee of the New York State Tax Commission, plus $90 per month in auto expenses.
VALUATION OF THE HUSBAND’S TEACHING LICENSE
Both parties agree that defendant’s teaching license is marital property subject to equitable distribution. (O’Brien v O’Brien, 66 NY2d 576 [1985]; McGowan v McGowan, 136 Misc 2d 225, mod 142 AD2d 355 [2d Dept 1988].) In the wake of the Court of Appeals landmark decision in O’Brien (supra), not only medical licenses (O’Brien v O’Brien, supra; De Stefano v De Stefano, 119 AD2d 793 [1986]; Maloney v Maloney, 137 AD2d 666 [1988]; Raff v Raff, 120 AD2d 507 [1986]), but law degrees (Cronin v Cronin, 131 Misc 2d 879 [1986]; Briger v Briger, 110 AD2d 526 [1985]; Holihan v Holihan, NYLJ, Jan. 15, 1987, at 13, col 2), accounting degrees (Vanasco v Vanasco, 132 Misc 2d 227 [1986]; Cohen v Cohen, 104 AD2d 841 [1984]), a podiatry license (Morton v Morton, 130 AD2d 558 [1987]), a doctor’s assistant certificate (Morimando v Morimando, 145 AD2d 609 [1988]), teaching certificates and academic degrees (McGowan v McGowan, supra) and even the celebrity-type career of a model/actress (Golub v Golub, 139 Misc 2d 440 [1988]) have been held marital property subject to equitable distribution.
In this case, where the defendant has been employed as a teacher for 15 years, and his license has "merged” into his teaching career, this court must determine the novel issue of the value of the resulting career. The significance of merger of a teacher’s license with a teaching career obviously differs from the merger of a professional license into a practice, where the courts have valued and distributed the practice. (Marcus v Marcus, 135 AD2d 216, mot to amend remittitur *853 granted 137 AD2d 131 [2d Dept 1988]; Schoenfeld v Schoenfeld, NYLJ, July 6, 1988, at 27, col 6 [Sup Ct, Nassau County]; Vanasco v Vanasco, supra.)
In Marcus v Marcus (supra), the court held the defendant husband’s license had merged in and been subsumed into the doctor’s 30-year medical practice. In Vanasco (supra), an accountant’s license was held to have merged into the practice after nine years. In Schoenfeld (supra, at 28, col 4), the court found a partial merger of the doctor’s license into his "fledgling practice” and subtracted the value of the practice from the license. In the aforesaid cases, the theory of merger was applied to avoid "two bites of the same apple” or double recovery to the nontitled spouse.
While the courts have recognized the merger of licenses into careers where no practice results and have held the careers are marital property, none of the cases have explored the methodology appropriate for valuation of careers. In recognizing that a teacher’s certification is a marital asset, subject to equitable distribution, the court in McGowan (supra, at 230) explicitly stated that it "has not answered any questions as to valuation, contributions to the acquisition of the degree, and whether its value has been extinguished or diminished by a merger in a better paying position in a school district or elsewhere”. In Tessler v Tessler (18 [No. 3] Fam L Rev 11 [NY St B Assn 1986], Rigler, J. [where the defendant husband doctor was a salaried hospital employee]), the court stated "even were the license to be merged into a practice or as herein the absence of a practice into the husband’s 'career’, the question arises as to the method of evaluation of the husband’s career choice or indeed whether that career is a marital asset.” (In that case, the matter came before the court by motion of plaintiff’s for expert fees to evaluate the husband’s license, which was granted by the court.) In Giannelli v Giannelli (20 [No. 1] Fam L Rev 21 [NY St B Assn, Mar. 1988]), the court noted the wife had been employed "several years” as a teacher, but did not indicate the specific number of years she had been so employed. In Golub v Golub (supra, at 446) the court recognized the wife’s "celebrity status” as marital property, finding that there is "no rational basis upon which to distinguish between a degree, a license, or any other special skill that generates substantial income.” However, the method by which that career was to be evaluated is not revealed in the reported decision.
Dr. David Zaumeyer, CPA, Ph.D., testified as the wife’s *854 expert. He concluded that the value of the husband’s license ranged from $111,500 to $252,000 (depending upon valuation and retirement dates used). His method of valuation purported to mirror that of the expert in O’Brien (66 NY2d 576, supra), in that he compared the defendant’s earnings as a teacher to an "adjusted figure”, intended to represent what the defendant’s earnings would have been had he remained employed as a building superintendent. He projected the differential between the two income streams forward, and then discounted the result to present value. Although he agreed that the teaching license had "merged” in the course of the 15 years the defendant had been employed as a teacher, he valued the defendant’s career as though it were a newly acquired license giving no effect to the fact of merger. He failed to reconcile the apparent contradiction of this position with a strikingly different one he had advanced in a publication, Valuating Professional Practices and Licenses The Merger of Professional Licenses and Practices (ch 4, at 209 [Prentice Hall Business 1987]). In that article, Dr. Zaumeyer wrote:
"As long as the license can be held out from its use and practice, it can be valued, but the time period of which one can value the license alone is limited. Eventually the degree and license become ' "merged” ’, with the private practice or corporate career positions and become virtually indistinguishable from them.
"There are few available statistics to just when the two merge. It would seem that five years is a reasonable length of time to mature in one’s chosen field and after that experience, reputation, contact, privileges and politics also become dominant factors in professional practice and development.”
In addition to ignoring the fact of merger, Dr. Zaumeyer’s actual method of evaluation in this case is flawed and unacceptable. He compared the defendant’s actual earnings as a teacher to a speculative figure not representative of the actual earnings of building superintendents during the same period. Rather than using the Building Service Employees Union wage scales, to reflect the actual earnings of superintendents during the comparable period (he acknowledged these figures would have been the correct ones but that he had been unable to obtain them), Zaumeyer simply projected Parlow’s income as a building superintendent forward at a rate of future increases which was based upon his past earnings and increases as a superintendent. Thus on the one hand, full weight was given to the results of labor negotiations of the powerful *855 teacher’s union, while no consideration was given to the result of labor negotiations of the building superintendent’s union during the same period. In the absence of any valid comparable figures, the estimated differential used by Zaumeyer is pure speculation. I find it quite possible that an actual comparison of the two earnings streams might indicate that building superintendents in New York City over the past 15 years earned more than shop teachers during the same period. The expert’s conclusions are further flawed by his failure to take into account the economic value of an apartment provided the Parlow family during every year that Mr. Parlow worked as a superintendent, which should have been considered an increment to his earnings. Nor did Zaumeyer consider tax factors as impacting his conclusions, notwithstanding advice he had offered in the article above referred to, where he wrote, "a net tax differential should be used to further reduce the overall incremental value of the license in any forecasting procedure.”
Mr. James Mazarin, CPA, testified for the defendant. He asserted that since Mr. Parlow’s teaching license had merged into his teaching career, the career, not the license, must be evaluated. The method he used in evaluating Mr. Parlow’s teaching career was to compare the income generated by Mr. Parlow as a teacher to that of other teachers with the same training and tenure. He contended that since such teachers’ salaries were negotiated by the same teacher’s union they would be equivalent and unless Mr. Parlow earned additional other income* (related to his teaching career) there would be no "excess earnings” or "goodwill” available for distribution.
defendant’s teaching career has no value
I agree with both experts that defendant’s teaching license is a marital asset and that the teaching license has merged into the defendant’s teaching career. I further agree with plaintiff’s expert that in this case, the defendant’s career has no value for purposes of equitable distribution. The concept of "increased earnings capacity” resulting from Dr. O’Brien’s acquisition of a medical license is inapplicable in the case at bar, where the license holder’s earning capacity has been fully *856 realized. Furthermore, the equitable considerations that undoubtedly motivated the O’Brien court are fundamentally different where the license has been held for a substantial period of time and has merged into a career.
To apply the license evaluation theory of O’Brien (66 NY2d 576, supra) to the facts at bar would ignore and pervert the rationale underlying that decision.
Dr. O’Brien sued his spouse for divorce two months after receiving his medical license. For nine years, Mrs. O’Brien had contributed 76% of the total family income to support her husband, and herself. She postponed having children. She had given up her career to move with him to enable him to pursue his medical license. After graduation, he returned to the United States where he commenced training in general surgery. Two months after receipt of the license he sued her for divorce. At the time he commenced the action, he was still in residency and had not begun to establish any practice. The Court of Appeals reversed the Appellate Division and affirmed the trial court and held the medical license constituted marital property. Rejecting the husband’s argument that the equitable distribution statute applied only to ongoing professional practices, the court held that the license reflecting "enhanced earning capacity” was a marital asset to be distributed. "A professional license is a valuable property right, reflected in the money, effort and lost opportunity for employment expended in its acquisition, and also in the enhanced earning capacity it affords its holder” (supra, at 586).
In O’Brien (supra), the wife’s expert valued the husband’s license at $472,000 having arrived at that figure by comparing the average income of a college graduate and that of a general surgeon throughout the work/life expectancy of the husband, considered Federal income taxes, an inflation rate of 10%, a real interest rate of 3%, and capitalized the difference in average earnings and reduced the amount to present value. The wife was awarded 40% or $188,800 as a distributive award to be paid in 11 installments.
In the O’Brien case (supra), the court had nothing to award the wife, other than a share of the defendant husband’s license, or maintenance, as compensation for her contribution in money, labor and personal sacrifice to the increased earnings capacity (represented by the medical license) that her husband was likely to enjoy for years to come. Rather than awarding Mrs. O’Brien maintenance (which would terminate *857 upon her remarriage or either party’s death) the court opted for holding that the license constituted marital property subject to equitable distribution.
Contrast the case at bar, where Mrs. Parlow had benefited from the increased earnings and improved life-style resulting from her husband’s acquisition of his teacher’s license for the past 15 years. Contrast the fact that at the time of trial, his earning capacity was established while Dr. O’Brien’s had yet to be realized. Contrast the fact that Mr. Parlow’s pension, annuity, and the parties’ marital residence, all fruits of his increased earnings capacity, are available for equitable distribution, while the O’Briens had accumulated no assets whatsoever.
Plaintiff warns that inequities will result should the court differentiate its treatment of careers into which licenses have merged and unmerged licenses, pointing to the fact that the moment in time when merger occurs is arbitrarily determined and that substantially disparate results may flow from that fortuitous determination. Assuming that a teaching license merges into a teaching career in five years (as Zaumeyer suggests) and that the license in the case at bar had been enjoyed for 4 years rather than 15, plaintiff argues that Mrs. Parlow might have recovered a substantial marital property distribution by virtue only of having terminated her marriage earlier rather than later. This concern (to which I am sympathetic) is poignantly reminiscent of similar caveats shared by prominent matrimonial experts who, early on, contemplated the potential inequities flowing from the license valuation theory applied in O’Brien (66 NY2d 576, supra). What if Dr. O’Brien died or became disabled shortly after his license had been valued and partially distributed, and that valuation had been based upon his work/life expectancy? What if he chose to practice in an economically deprived area and his earnings were far less than those of the average general surgeon, upon which the valuation was predicated? Clearly his license may have been valued higher than the value ascribed to such a practice. In an article succinctly stating these significant concerns, O’Brien: Picking Our Way Through The Bramble Bush of Valuation (19 [No. 1] Fam L Rev 7,10 [NY St B Assn, Mar. 1987]), Sandra M. Jacobson, Esq. concludes, ”[i]f practices continue to be valued as they have been in the past [subsequent to O’Brien] while licenses are valued as in O’Brien and its progeny, the non-licensed spouse whose doctor or lawyer husband or wife says goodbye the day he or she starts the first *858 job after completing professional training may count herself or himself blessed by the Court of Appeals if not by heaven.”
Addressing the legitimacy of these concerns, and the rationale of the Court of Appeals in O’Brien (supra), I find it unreasonable to assume either that the risks and speculation inherent in that holding were not considered by our highest court, or that the equities favoring Mrs. O’Brien persuaded that Bench to permit her "hard case” to make "bad law”. I find it more likely that the court recognized the risks and speculation inherent in license valuation and balanced them against the inequities that would inevitably result absent a finding that the license had value, and determined to rely upon the discretion of the trial court to "do justice” by utilizing the flexibility of the New York equitable distribution statute.
Furthermore, were Mr. Parlow’s career valued pursuant to plaintiff’s argument and distributed in part to Mrs. Parlow, both philosophical consistency and equitable considerations would require an evaluation and potential distribution of Mrs. Parlow’s career as well. Why should his teaching career be valued while her career as a civil servant is disregarded? Both are W-2 employees. Both have achieved increased earnings capacity in the course of the marriage, her earnings having increased from $3,000 per year at the time of marriage (as a meat-packer) to $27,000 (as employee of the State Tax Commission), while his increased from $12,000 as a superintendent to $44,000 per year (as a teacher). In the course of the marriage, he earned a teaching license and she (who had been a high school dropout when married) earned a graduate equivalency degree and 30 college credits. Since a license is virtually extinguished when it merges into a practice or career (Marcus v Marcus, 135 AD2d 216, supra), the fact that Mr. Parlow’s teaching career required his prior acquisition of a license, and Mrs. Parlow’s career did not, should not constitute such a distinction as to cause the one to be valued and the other disregarded. The existence or nonexistence of a license initiating the career is irrelevant to the fact that a career has been achieved, or to its valuation and potential distribution.
Nor is there rational justification in holding certain careers to be marital property and others not. Why is the "celebrity status” career of a model/actress (Golub v Golub, 139 Misc 2d 440, supra) or the career of an entertainer (Getz v Getz, Westchester County, Feb. 1989, index No. 13940/81, Colabella, *859 J.) any more a marital asset than, for example, the career of a Judge, secretary, hairdresser, construction worker or chef? Webster defines career as “a chosen pursuit, the general course and progression of life”. Certainly neither the Legislature nor the Court of Appeals intended to provide relief in unequal measure to noncareered spouses.
Plaintiffs valuation of defendant’s teaching career as if it were an unmerged license (as in O’Brien, supra), if carried to logical conclusion, would result in increased and protracted litigation. Careers would be found to exist in most cases, requiring evaluation. Since income commonly increases with advanced experience, a comparison between income streams flowing from earlier and later careers will be likely to produce significant differentials, causing most careers to have value. The careers of both working spouses and their respective contributions would require further comparison. The O’Brien court, concerned with the special circumstances of the newly acquired license, did not express any intention to pave the way for this extravagant and impractical result, nor can such interpretation be rationally imputed to that decision.
It is clear that there will be cases where inequities result from the valuation of established careers at zero, as, where the careered spouse has substantially greater earning capacity than the non- (or lesser-) careered spouse, and the marital assets are limited or nonexistent. In such cases an award of maintenance would be the remedy more consistent with the statute and less fraught with speculation than efforts to convolute or distort the concept of marital property by valuing established careers as though they were newly acquired licenses.

 If Parlow had engaged in entreprenurial activities related to his teaching career, such as tutoring, running a camp or lecturing, his income would have exceeded that of other teachers of the same tenure and status and his career would have had a positive value.