OPINION OF THE COURT
H. Patrick Leis, III, J.
This action for divorce, equitable distribution and other ancillary relief was tried on February 25, 28, March 5, and 6, 1991. The plaintiff, Lisa Gastineau, is represented by counsel. The defendant, Marcus Gastineau, appeared pro se. A written summation was received from plaintiff’s counsel on March 13, 1991 and from Marcus Gastineau on April 3, 1991.
*814 FACTS
The parties were married in December of 1979. This action was commenced in September 1986. Consequently, this is a marriage of short duration. The plaintiff is 31 years old and the defendant is 34. The parties have one child, Brittany, born on November 6, 1982.
At the beginning of the trial the plaintiff testified as to specific allegations of cruel and inhuman treatment allegedly committed by the defendant. The defendant remained mute, neither admitting nor denying these allegations. The court thereupon granted the plaintiff a divorce based on cruel and inhuman treatment (Domestic Relations Law § 170 [1]).
The parties married just after Marc Gastineau had been drafted by the New York Jets to play professional football. The plaintiff, at that time, was a sophomore at the University of Alabama. The plaintiff never completed her college education, nor did she work during the course of the marriage.
In 1982, when Brittany was born, the parties purchased a house in Huntington, New York, for $99,000. In addition to the purchase price, the plaintiff and defendant spent another $250,000 for landscaping and other renovations. This money came from the defendant’s earnings as a professional football player.
According to the uncontroverted testimony of the plaintiff, in 1979 (the defendant’s first year in professional football) the defendant earned a salary of $55,000. In his second year, 1980, the defendant’s salary was approximately $75,000. In 1981 it was approximately $95,000 and in 1982 he earned approximately $250,000. The defendant’s tax returns (which were not available for the years 1979 through 1982) indicate that the defendant earned $423,291 in 1983, $488,994 in 1984, $858,035 in 1985, $595,127 in 1986, $953,531 in 1987 and in 1988, his last year with the New York Jets, his contract salary was $775,000 plus $50,000 in bonuses. It must be noted that in most years the defendant earned moneys in excess of his contract salary as a result of promotions, advertisements and bonuses.
In 1985 the parties purchased a home in Scottsdale, Arizona, for $550,000. During the course of the parties’ marriage plaintiff and defendant acquired many luxury items including a power boat, a BMW, a Corvette, a Rolls Royce, a Porsche, a Mercedes and two motorcycles. They continually had a housekeeper who not only cleaned the house but prepared the *815 parties’ meals. In addition, the parties frequently dined out at expensive restaurants. The plaintiff testified that as a result of this life-style she has become accustomed to buying only the most expensive clothes and going to the best of restaurants.
In 1988 the defendant began an illicit relationship with Brigitte Nielsen. When Ms. Neilsen was diagnosed as having cancer the defendant testified that he could no longer concentrate on playing football. At that time the defendant was under contract with the New York Jets at a salary of $775,000. He left professional football in October 1988 (breaking his contract) after the sixth game of the 1988 season. The defendant went to Arizona and remained with Ms. Nielsen while she underwent treatment for cancer.
Regardless of whether the defendant wanted to be with his girlfriend while she underwent treatment for cancer, he had a responsibility to support his wife and child. The court cannot condone Mr. Gastineau’s walking away from a lucrative football contract when the result is that his wife and child are deprived of adequate support.
According to the testimony adduced at trial, there are 16 games per season in the National Football League (NFL). Players are paid one sixteenth of their contract salary at the end of each game. Based on the defendant’s salary for 1988 ($775,000), he received $48,437 per game. The defendant played six games in the 1988 season and received approximately $290,622 plus $50,000 in bonuses. He was entitled to an additional $484,437 for the 10 games remaining in the season. This court finds that by walking away from his 1988-1989 contract with the NFL the defendant dissipated a marital asset in the amount of $484,437. (Domestic Relations Law § 236 [B] [5] [d] [11].)
Whether or not the defendant would have been offered a contract by the New York Jets for the 1989/1990 football season if he had not broken his 1988/1989 contract is pure speculation. In professional football there are no guarantees. Variables such as age, how an athlete plays, the ability of other players seeking to fill his position, as well as possible injuries sustained during the season, make it impossible to determine with certainty whether or not the defendant would have been re-signed by the New York Jets had he finished the 1988/1989 season. It must also be noted that there has been no testimony offered by the plaintiff to establish that the defendant would have been re-signed by the New York Jets for the 1989/1990 season had he not broken his contract.
*816 The speculative nature of the defendant’s future in professional football is highlighted by the fact that in 1989 he tried out for the San Diego Chargers, the Los Angeles Raiders and the Minnesota Vikings, without success. The New York Jets also refused to offer him a contract. In 1990 the defendant did acquire a position with the British Colombia Lions in the Canadian Football League at a salary of $75,000. He was cut, however, less than half way through the season. The defendant played 5 of the 18 scheduled games and was paid approximately $20,000. The defendant’s performance in the Canadian Football League lends credence to his claim that he no longer has the capacity to earn the moneys that he once made as a professional football player. Under these circumstances the court is limited to considering the dissipation of a marital asset valued at $484,437, to wit: the remaining amount of money that the defendant was eligible to collect pursuant to his 1988/1989 contract.
While defendant admits that he has name recognition, he claims that his name has a negative rather than a positive connotation. The defendant testified that because of his antics on the field (such as his victory dance after sacking a quarterback), the fact that he crossed picket lines during the NFL player’s strike and because he walked away from his professional football career, his name has no value for promotions or endorsements. There has been no evidence presented to the contrary by the plaintiff.
The defendant testified that his chances of obtaining employment with a professional football team are almost nil. Although he is presently attempting to obtain a position at a Jack LaLanne Health Spa he could not provide details as to the potential salary. The defendant has also attempted to enter professional boxing. No testimony has been elicited by the plaintiff, however, as to the defendant’s financial potential as a professional boxer. Since the defendant left professional football he has not worked or earned any money (except for the $20,000 that he earned when he played football in Canada). According to the defendant, Ms. Nielsen paid for all of the defendant’s expenses during the period of time that they lived together.
After the defendant failed to appear for a number of court dates and also failed to comply with this court’s pendente lite order, the court directed that the defendant’s NFL severance pay be sequestered pursuant to Domestic Relations Law § 243 and the plaintiff be appointed receiver and sequestrator of *817 said funds (which amounted to approximately $83,000 after deducting taxes).
According to plaintiff the entire $83,000 (reflecting the defendant’s total net severance pay from the NFL) was spent by her as follows: $32,000 was used to pay mortgage arrears on the Huntington house (which still has approximately $15,000 outstanding in arrears), $22,000 went to the plaintiff’s attorneys, $15,000 went to repay loans taken out by the plaintiff to pay necessary expenses and the rest, approximately $14,000, went for landscaping, medical insurance, electricity, fuel oil, telephone bills, dental and doctor bills.
PRIMARY MARITAL ASSETS
With all of the money that the defendant earned throughout the course of his professional football career he has retained only three significant marital assets: (1) the Huntington house, which has been valued at approximately $429,000 and has an outstanding mortgage of $150,000; (2) a house located in the State of Arizona which was purchased for approximately $550,000 and has a $420,000 mortgage (which in all probability will be sold at foreclosure); (3) the defendant’s severance pay from the NFL of approximately $83,000.
It is clear that the defendant has also dissipated a marital asset worth approximately $324,573 (to wit: $484,437 the defendant was entitled to receive pursuant to his 1988/1989 contract tax effected by 33%, reflecting approximate Federal and State income tax). Although neither the plaintiff nor the defendant attempted to tax effect this dissipated marital asset, it is clear that the defendant would not have actually received $484,437 had he finished the 1988/1989 season. The court therefore, on its own, has tax effected this amount by 33%, approximately what the defendant would have paid in Federal and State taxes had he actually received the $484,437. In this regard the court has considered the tax returns of the parties (which are in evidence) with reference to their tax consequences and takes judicial notice of the fact that compensation for service constitutes income (Internal Revenue Code [26 USC] § 61 [a] [1]) which is taxable (Internal Revenue Code [26 USC] §§ 1, 63; Tax Law § 620 et seq.; Richardson, Evidence §§ 17, 18 [Prince 10th ed]).
EQUITABLE DISTRIBUTION
It is a guiding principle of equitable distribution that par *818 ties are entitled to receive equitable awards which are proportionate to their contributions, whether direct or indirect, to the marriage (Ullah v Ullah, 161 AD2d 699, 700 [2d Dept 1990], lv denied 76 NY2d 704 [1990]; Price v Price, 69 NY2d 8 [1986]; Arvantides v Arvantides, 64 NY2d 1033 [1985]; Thomas v Thomas, 145 AD2d 477 [2d Dept 1988]).
In this case, the plaintiff testified that during the course of the marriage she supervised the renovations made on the Huntington house, traveled with the defendant wherever he trained and, with the assistance of a full-time nanny, raised and cared for their child.
This is not a long-term marriage, and there has been minimal testimony elicited concerning the plaintiff’s direct or indirect contributions to the defendant’s acquisition of marital assets. Although it was the defendant’s own athletic abilities and disciplined training which made it possible for him to obtain and retain his position as a professional football player, equity dictates, under the facts of this case, that the plaintiff receive one third of the marital assets. The defendant’s decision to voluntarily terminate his contract with the New York Jets, depriving plaintiff and the parties’ child of the standard of living to which they had become accustomed, his failure to obtain meaningful employment thereafter and the indirect contributions made by the plaintiff during the course of the marriage warrant an award to the plaintiff of one third of the parties’ marital assets. The court is also mindful of the fact that during the years of the defendant’s greatest productivity, the plaintiff enjoyed the fruits of defendant’s labors to the fullest (Parlow v Parlow, 145 Misc 2d 850 [Sup Ct, Westchester County 1989]), unlike the landmark O’Brien case (O’Brien v O’Brien, 66 NY2d 576 [1985]), where a newly licensed professional discarded his wife after she provided years of contributions to the attainment of his medical license.
There are only two marital assets to be considered in granting plaintiff her one-third distributive award: (1) the Huntington house, and (2) the $324,573 dissipated marital asset. The Arizona house has no equity.
The Huntington house is valued at $429,000. It has a $150,000 mortgage with $15,000 owed in back mortgage payments. It thus has an equity of $264,000. One third of the equity would entitle the plaintiff to $87,120. When one adds $107,109 (one third of the $324,573 tax effected marital asset which was dissipated), the plaintiff would be entitled to *819 $194,229. This would encompass plaintiffs one-third distributive award of the parties’ sole remaining marital asset (the Huntington house) and her one-third share of the marital asset dissipated by the defendant. If one adds this $194,229 to the arrears owed by the defendant on the pendente lite order ($71,707) plaintiff could be awarded the total equity ($264,000) in the Huntington house in full satisfaction of her one-third distributive award of the parties’ marital assets and still have approximately $1,936 remaining as a credit. The court awards plaintiff the Huntington house and grants her a judgment for $1,936 for the remaining arrears owed to her.
Neither side has offered proof as to the present value of the Arizona house or the extent of arrears on mortgage payments (Gluck v Gluck, 134 AD2d 237 [2d Dept 1987]). It would appear, however, that there is no equity remaining in the Arizona house. The court awards the Arizona house to the defendant. The court directs that each party take whatever steps are required to effect the transfer of the deed to the real property awarded to the other party so as to convey title to said property in said other’s name alone.